UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

KIMBERLY L. GORE,                )
                                 )
            Plaintiff,           )
                                 )
      vs.                        )      Case No. 2:14-CV-0019 (CEJ)
                                 )
CAROLYN W. COLVIN, Acting        )
Commissioner of Social Security, )
                                 )
            Defendant.           )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social
Security Administration.

## I.  Procedural History

On March 9, 2011, plaintiff Kimberly L. Gore filed applications for disability
insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, and supplemental security
income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of January
15, 2011.  (Tr. 146-47, 147-53).  After plaintiff's application was denied on initial
consideration (Tr. 87-92), she requested a hearing from an Administrative Law
Judge (ALJ).  (Tr. 93-94).  Plaintiff and counsel appeared for a hearing on August
28, 2012.  (Tr. 34-81).  The ALJ issued a decision denying plaintiff's application on
September 14, 2012.  (Tr. 7-33).  The Appeals Council denied plaintiff's request for
review on January 9, 2014.  (Tr. 1-6).  Accordingly, the ALJ's decision stands as the
Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability Application Documents

In her Disability Report filed on March 11, 2011 (Tr. 206-15), plaintiff listed her disabling conditions as major depressive disorder, recurrent asthma, fatigue, arthritis, GERD, irritable bowel syndrome, and borderline personality disorder. She took prescription medications for bone health, depression, contraception, blood pressure, GERD and asthma. (Tr. 210). She also took potassium and iron and over-the-counter medications for her heart, sinuses, cholesterol, and pain. In her Disability Report filed on July 18, 2011 (Tr. 216-21), plaintiff stated that her pain and depression had worsened. She delayed or occasionally did not engage in personal grooming. (Tr. 219). At other times she was obsessive about personal hygiene. She was sleeping less, had become less focused, could not keep her house clean, and had less of a desire for things in her life.

Plaintiff's friend, Johanna Charlton, and aunt, Tiana Gollaher, completed Third-Party Function Reports in August 2011. (Tr. 222-25, 226-29). Ms. Charlton described plaintiff as depressed and in pain a lot. (Tr. 223). She stated that plaintiff sometimes would put off caring for her personal hygiene for day or two. (Tr. 224). She did not have difficulty performing household chores, but they had to be done perfectly. She acted rudely to public authorities, appeared stressed on a daily basis, and easily forgot what she was doing. Ms. Gollaher stated that plaintiff's mood constantly changed and her impulsive manner forced her to be alone. (Tr. 227). She experienced pain in her back, shoulders, head and neck. She did not have difficulties with personal hygiene or household chores, but would procrastinate or become angry if they were done improperly.

## B.  Testimony at the Hearing

Plaintiff was 35 years-old at the time of the hearing.  (Tr. 37).  She had two children, ages 15 and 11, neither of whom lived with her.  Her daughter had been adopted by others, and her son lived with his father who had legal custody of him. (Tr. 39).  She had never been married and did not have a permanent residence. (Tr. 38-40).  She alternated between staying with her parents and staying at her son's father's house.  (Tr. 40).  She had a medical card, and received food stamps and Medicaid assistance.  (Tr. 41).  Plaintiff graduated from high school and completed two years of technical education in office systems.  (Tr. 41).  Plaintiff's last employment was at General Mills where she had worked for two and a half years.  In January 2011, she walked out on the job on an impulse when her employer moved her to work in an area and with people she felt uncomfortable around. (Tr. 38).

Plaintiff testified that her mental health issues stemmed from an experience she had when she was four or five.  (Tr. 44).  Plaintiff witnessed her mother's boyfriend get shot and killed by an intruder who also held a loaded gun to her and her sister's heads.  Plaintiff stated that her mother married twice and had 35-40 live-in boyfriends before plaintiff reached the age of seven.  (Tr. 45).  Plaintiff also said she had been molested and raped three times as a teenager.  (Tr. 44).  She experienced post-traumatic stress disorder as a result of her experiences, and had recurring daydreams and nightmares of these events.  (Tr. 49).  She saw a psychiatrist once a month, but did not receive counseling because she could not afford the fee.  (Tr. 42).  She had previously received free counseling from White Oaks Counseling, but was let go from their program.  (Tr. 43).

Plaintiff testified that she had "bipolar depression" and sometimes stayed in bed for three or four days at a time. (Tr. 45). She had worn her night clothes for as long as a week, but she took care of her personal hygiene and was a perfectionist about cleaning. (Tr. 46, 52). Before she began taking medication for her depression, plaintiff had crying spells two or three times a day every day lasting from 30 minutes to all day. After she began taking the medication in June or July 2011, her crying spells decreased to once or twice a day and were of shorter duration. (Tr. 47). Plaintiff stated that she felt nervous around others, and described herself as a hermit. Once or twice a month she actually enjoyed leaving her house. She tried to go grocery shopping early in the morning when the stores were empty. (Tr. 56). To pass time during the day, plaintiff said she cross-stitched, crocheted, engaged in housekeeping, and read the Bible. (Tr. 56). She did not attend church or participate in any social organizations.

Plaintiff testified that she lost custody of her children seven years earlier, because she was deemed suicidal, homicidal and unsafe to be around her children. (Tr. 48). She had not seen her daughter since that time. (Tr. 39). Her last attempt to commit suicide was seven years before the hearing, and she was involuntarily committed to psychiatric care. (Tr. 48). She had been in rehabilitation at that time for abusing Vicodin and for alcoholism and she later successfully completed the program. (Tr. 49). She testified to having obsessive thoughts about hurting her children and others. (Tr. 52-53).

Plaintiff was also diagnosed with irritable bowel syndrome, and experienced diarrhea six to ten times a day for ten to fifteen minutes at a time. (Tr. 53). She was usually able control her bowels long enough to reach a restroom. (Tr. 54).

Plaintiff testified that she had sciatica, which caused constant pain in her legs, hips, and lower back. (Tr. 55). She also said she had two bulging discs in her neck that affected her neck, shoulders and arms.

The ALJ asked plaintiff about her past work experience. (Tr. 58-61). In the preceding fifteen years, plaintiff had worked in a fast food restaurant, as a cashier at a convenience store, as a CNA at several hospitals and a nursing home, as a stocker at Walmart, and as a laborer and night cleaning crew at a factory. Plaintiff stated that she could not return to these jobs, either because of her social phobia and impulsive anger issues or because of pain from the physical requirements of the job. (Tr. 67-70). She testified that she was frustrated with herself for being unable to maintain a job, but she could not handle being around people and wanted to cry all of the time. (Tr. 71).

Susan Shea, a vocational expert, provided testimony regarding the employment opportunities for an individual of plaintiff's age, education, and work experience, who retains the residual functional capacity for light work but is limited to simple, routine, and repetitive tasks not requiring more than superficial interaction with the public or coworkers. The ALJ asked the vocational expert if this individual could perform any of the plaintiff's past relevant jobs. Ms. Shea opined that such an individual would be able to perform the assembly work in a factory, but not the clean-up work which, based on plaintiff's testimony, involved more than superficial interaction with coworkers. (Tr. 77-78).

When asked if she could identify any other jobs that exist in the local, regional, or national economy for that hypothetical person, Ms. Shea stated there were cleaning or housekeeping jobs, machine tending jobs, and other manual work.

(Tr. 78-79). When asked if there were any jobs for an individual with the same vocational factors as plaintiff but with the inability to engage in sustained work activity for a full eight-hour day on a regular and consistent basis, Ms. Shea opined that there were no jobs available for such a person. In response to questions from plaintiff's counsel, Ms. Shea opined that an individual in the identified jobs could be off-task no more than 10% of the time and still be considered employable. (Tr. 79-80). Ms. Shea also stated that an employer would tolerate no more than two days a month of absenteeism after the probationary period in the identified jobs, and no absences during the probationary period of employment. (Tr. 80).

### C. Medical Records

On May 5, 2010, plaintiff was treated at the Community Health Center for depression, which she reported had been getting worse. (Tr. 333-34). She had not taken medication to treat her mental illness for four or five years. She was prescribed Celexa. At a follow-up appointment on June 9, 2010, she reported that her depression had improved, but she had lower back pain shooting up and down her spine for which she was prescribed a muscle relaxer. (Tr. 329-30). At a follow-up appointment on July 8, 2010, she reported that her back pain was better. (Tr. 327-28). She also stated that her mood was better, but had room to improve. She had begun to do housework again and enjoyed bathing.

Plaintiff went to Hannibal Regional Hospital on August 16, 2010, complaining of an acute, throbbing left ear pain of four months' duration. (Tr. 294-302). Timothy B. Raleigh, D.O., diagnosed her with eustachian tube dysfunction, upper respiratory infection, and nonspecific allergies. He prescribed Claritin, a Nasocort inhaler, and doxycycline. Plaintiff returned the next day, complaining of headache,

ear pain, dizziness and vomiting.  (Tr. 274-93).  Following blood tests, an EKG, and CT head scan, Rachel Hammel, M.D., made a diagnosis of headache and vertigo and prescribed Antivert, Bactrim, and Ultram.  Plaintiff continued to complain of dizziness, blurred vision, and a constant headache at follow-up visits in the following weeks at the Community Health Center (Tr. 320-25).

Plaintiff was treated at Hannibal Clinic on September 21, 2010.  (Tr. 253-56). She reported a medical history of hypertension, hyperlipidemia, anxiety/depression, gastroesophageal reflux, and irritable bowel syndrome.  She was taking Celexa, Zantac, Claritin, Lisinopril, and various over-the-counter medications at that time. She reported a history of addiction to Vicodin, codeine, and alcohol, but stated she was in recovery.  She also reported smoking a pack of cigarettes per day since she was 16.  On examination, Larry Nichols, D.O., reported her vital signs as unremarkable.  Plaintiff was overweight at 194 pounds.  She complained of chronic left ear pain on a daily basis for the previous six months, but no abnormalities were found on examination.  She also complained of generalized fatigue, stating, "I am just so tired I can hardly go."  She reported problems of intermittent diarrhea and cramping.  Dr. Nichols prescribed Levbid for irritable bowel and an increased fiber intake in her diet.

Plaintiff returned to Hannibal Clinic on September 27, 2010.  (Tr. 257-59). She complained of an aching pain with occasional sharp exacerbation in her left ear progressing into the left side of her neck.  Kevin B. Imhof, D.O., found some guarding to palpation over the soft tissue of her neck, but stated the etiology was uncertain.  Dr. Imhof advised her to take Ibuprofen for three to four weeks for the neck pain.  At a follow-up evaluation on October 29, 2010, plaintiff did not report

improvement to her neck or ear pain. Dr. Imhof prescribed Celebrex and a CT scan of the head and neck. (Tr. 258-59). At a follow-up examination on November 9, 2010, plaintiff reported that the Celebrex was not successful. (Tr. 259). She did not undergo the CT scan, because her insurance would not cover it. Dr. Imhof then prescribed a trial of Tegretol. On December 7, 2010, plaintiff underwent a physical examination at Willow Care that was found within normal limits. (Tr. 252). At a follow-up visit at the Community Health Center for her depression, plaintiff was prescribed Wellbutrin in addition to Celexa. (Tr. 314-15).

On January 16, 2011, plaintiff went to Hannibal Regional Hospital for traumatic ankle pain. (Tr. 264-71). She reported that she had fallen on the ice that morning as she was heading to work and injured her left ankle. Examination revealed a tender left anterior ankle without swelling. The left ankle's range of motion was intact but painful. She was diagnosed with a sprained ankle, instructed to wear an ace bandage and air splint, and discharged. At a follow-up appointment at the Community Health Center, plaintiff reported a sharp burning pain in her ankle. (Tr. 312-13). On January 24, 2011, her ankle was diagnosed as healing, and she was told she could return to work the next day. (Tr. 310-11). At a visit to the Community Health Center on January 28, 2011, she complained of swelling on her ankle and stated that she had tried to return to work but experienced increased pain. (Tr. 308-09). She was referred for an orthopedic consultation.

At the University of Missouri Health Care, x-rays of plaintiff's left ankle did not show anything usual. (Tr. 248-53). She was taught how to desensitize her ankle and was prescribed Ibuprofen. She was also given a CAM boot to wear, and advised to not work for two weeks. At a follow-up appointment on March 1, 2011,

plaintiff's ankle was still very hypersensitive but showed no swelling.  (Tr. 346-47).

She was instructed to continue to wear the CAM boot, perform desensitization and

range of motion exercises, and take Ibuprofen.  On April 5, 2011, she reported no

pain in her ankle and was given an ankle brace to wear in replacement of the boot.

(Tr. 344-45).  At a visit to the Community Health Center on March 8, 2011, plaintiff

reported that she was not sleeping, was crying, felt restless, had suicidal thoughts,

and experienced diarrhea.  Her Wellbutrin prescription was discontinued due to

adverse side effects, and she was prescribed Citalopram.  She was also advised to

follow-up with a psychiatrist.

Karen A. MacDonald, Psy.D., completed a consultative mental examination of

plaintiff on June 12, 2011.  (Tr. 354-59).  Dr. MacDonald noted plaintiff's history of

violent physical, sexual and verbal abuse.  She found that plaintiff exhibited

adequate personal hygiene, appropriate facial expressions, adequate eye contact,

and a cooperative nature.  She observed that plaintiff reflected feelings of

helplessness, worthlessness, hopelessness, suicidal ideation and attempts, and

extreme sadness.  Dr. MacDonald also noted that plaintiff experienced chaotic and

unstable interpersonal relationships and lifestyle.  She found plaintiff's attention,

memory, and ability to follow simple instructions were not impaired.  Her incidental

learning, pace and persistence, and abstract motor speed were impaired.  She

diagnosed plaintiff with major depressive disorder and borderline personality

disorder.  She assigned a Global Assessment of Functioning score of 50.[1]  She

---

[1] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning.  Impairment in functioning due to physical or environmental limitations is not considered.  American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 32-33 (4th ed. 2000).  A GAF of 41-50 corresponds with "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting)

noted that plaintiff would be capable of managing her own funds. Plaintiff reported that her longest employment had lasted two and a half years at General Mills, and she had lost her previous job as a nursing assistant because of her sprained ankle. Dr. MacDonald concluded that plaintiff could sustain a 40-hour workweek on a continuous basis if the work was simple and not detailed.

On July 25, 2011, plaintiff went to Hannibal Regional Hospital with reports of arm pain, back pain, and a headache. (Tr. 394-409). On examination, her left shoulder was painful on palpation and pain radiated to her left forearm with areas of numbness. An MRI found normal signal characteristic of the cervical spine. She was diagnosed with brachial radiculitis and prescribed Tylenol. She returned to the hospital on August 16, 2011, reporting dizziness, chronic head, neck and arm pain attributed to a bad neck, insomnia and occasional urinary incontinence, hot flashes, nausea, heartburn, and weakness in her entire body. (Tr. 440-50). She fully recovered after resting. She was diagnosed with vertigo and dehydration, and instructed to take meclizine for her motion sickness and drink more fluids.

On June 27, 2011, Barbara Markway, Ph.D., completed a Psychiatric Review Technique. (Tr. 360-71). Dr. Markway concluded that plaintiff suffered from a recurrent and severe major depressive disorder and borderline personality disorder. (Tr. 363, 365). Plaintiff had moderate difficulties in maintaining concentration, persistence or pace and maintaining social functioning; she had mild restriction of daily living activities. (Tr. 368). Dr. Markway also completed a Mental Residual Functional Capacity Assessment. (Tr. 372-74). She found that plaintiff was moderately limited in the ability to understand, remember, and carry out detailed

OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)." Id. at 34.

instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibited behavioral extremes. Dr. Markway concluded that plaintiff retained the ability to understand, remember, and carry out simple instructions, adapt to most changes in the work place, and make simple work-related decisions. Dr. Markway also anticipated plaintiff would have moderate difficulty interacting with supervisors and coworkers, and would perform best in a setting where she could work relatively independently with limited social contact.

Plaintiff underwent a mental health evaluation with Ted Oliver, MSW, LCSW, at Mark Twain Behavioral Health on August 29, 2011. (Tr. 388-92). Her hygiene was normal, and she denied suicidal ideations. She reported chronic problems with instability of interpersonal relationships, and the resulting inability to maintain steady employment. Mr. Oliver diagnosed her with borderline personality disorder and depressive disorder. He assigned her a GAF of 50. He also noted that "[d]ue to her current difficulties with impulsivity [and] reactivity, employment would be difficult." (Tr. 392).

On December 6, 2011, plaintiff sought treatment at Hannibal Regional Hospital for chest pain. (Tr. 452-74). She complained of chest discomfort radiating to her right chest area and arm, and numbness and tingling to her face, neck, hands, and feet. Following a chest x-ray and EKG, plaintiff was diagnosed with costochondritis and musculoskeletal chest pain. She was given Aspirin and Toradol IV during her visit, and prescribed Naprosyn. Plaintiff saw Dr. Nichols at Hannibal Clinic the next day. (Tr. 609-10). She reported that she needed to be on disability

because she just "can't deal with it."  Dr. Nichols told her that she needed to go ahead and try to function in her job, and opined that her symptoms were just a consequence of depression.

On December 12, 2011, plaintiff returned to Hannibal Clinic for an evaluation of her ears, nose and throat region due to bilateral ear and neck pain.  (Tr. 611-12).  She told Dr. Imhof that a recent MRI scan showed a disc problem in her neck.  Dr. Imhof encouraged her to follow-up with a rheumatologist.  On December 15, 2011, plaintiff sought treatment at Hannibal Regional Medical Group, reporting lower back pain for two weeks, which had worsened after a fall the previous day.  (Tr. 567-69).  She was advised to ice and heat the area.

Plaintiff underwent a psychiatric evaluation with Lyle Clark, M.D., at Hannibal Regional Medical Group upon referral by Dr. Nichols on December 29, 2011 (Tr. 513-16).  She stated that she needed to "get back on my medication for my severe, recurrent depression."  (Tr. 514).  She had recently gotten on Medicaid and was taking only Wellbutrin because she was getting it from the manufacturer.  She described symptoms of major depressive disorder, hypomanic episode, social phobia, posttraumatic stress disorder, and past alcohol and opioid dependence.  She reported two past suicide attempts seven to eight years prior by wrist cutting and by drinking bleach.  She stated that she had a strained relationship with family members, since she had to live with her child's father and had no income.  Dr. Clark diagnosed plaintiff with bipolar II, social phobia, and chronic PTSD.  He assigned her a GAF score of 51 for "multiple areas of moderate disturbance in

functioning."[2]  (Tr. 515).  She consented to discontinuing Wellbutrin and to starting Carbatrol and Lexapro.  At follow-up visit on January 19, 2012, plaintiff complained of problems with her boyfriend.  (Tr. 509-12).  She noted no difference since discontinuing Wellbutrin, and reported sleeping better with Carbatrol.  She said she had problems maintaining a normal schedule since she had worked nights for many years.  Because plaintiff could not get Lexapro, she was switched to Celexa.  She was found to be borderline hypothyroid and was started on Synthroid because of symptoms of poor energy and weight gain.  Dr. Clark noted that her mood appeared less depressed.

On February 28, 2012, plaintiff underwent neurologic consultation with Brett D. Hosley, D.O., at Hannibal Clinic regarding facial numbness, neuropathy, and tremor.  (Tr. 597-604).  She reported numbness in her cheeks and upper lip from the stitches in her nose following a dog bite.  She stated that she had "shakes" in her body and in her hands, but that they did not really interfere with her daily activities.  (Tr. 597).  She reported a constant sensation in her feet that felt like a "vibrating cellphone."  When plaintiff engaged in increased activity, her hands curled down into a flexed position. After walking or standing for a long time, her feet "feel like they are trying to curl down into flexion."  (Tr. 598).  Plaintiff also reported an aching pain in her posterior and lateral neck area, a sharp pain in her ears, and aching pain down her shoulders.  She complained of suffering "sciatics" for the past 12 years, which involved a sharp pain in her lower back that could go away for a few months and then return again.  (Tr. 598).  Dr. Hosley did not think

---

[2] A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 34.

plaintiff's symptoms of chronic pain were related to a neurologic disorder. She was referred for testing. Her MRI, EMG and nerve condition studies were reported as normal.

On March 7, 2012, plaintiff reported to Dr. Clark that she was feeling better and had an improved mood. (Tr. 506-08). Her hygiene was adequate and her mood appeared less depressed. She felt the Celexa was not working well, so she was switched to Lexapro. On that same day, plaintiff returned to Hannibal Clinic for a follow-up visit with Dr. Nichols. He noted that plaintiff had been evaluated "by just about most of the specialists that she could possibly see," including gastroenterology, gynecology, rheumatology, neurology, ear, nose, and throat specialists, "because of a variety of aches and pains and complaints." (Tr. 616). Dr. Nichols noted that nothing had been found from the consultations.

On March 21, 2012, plaintiff returned to Dr. Hosley for a neurology follow-up. (Tr. 605-08). She reported continuing to have significant pain and discomfort in her left neck, upper back, and shoulders. Plaintiff was again diagnosed with disturbance of sensation of undetermined etiology. Dr. Hosley found no evidence of a primary neurologic disorder, and thought the symptoms were in part related to other ongoing general medical and psychiatric issues.

On April 20, 2012, plaintiff reported to Dr. Clark that she had had a very bad week because of severe PTSD symptoms. (Tr. 502-05). Until then, she had been doing very well. She reported that her PTSD symptoms had been resolved for the most part due to interaction with her dog and its newborn puppies. She also felt her medication had been working. Dr. Clark noted that her hygiene was adequate,

and her mood appeared less depressed. Dr. Clark assessed her condition as worsened by stressors, but noted that she was recovering.

Plaintiff had a physical examination at Hannibal Regional Medical Group on April 25, 2012. (Tr. 552-56). She reported a decreased energy level and was sleeping poorly. She stated she slept 11 hours a night on average, had abdominal and neck pain, and experienced anxiety and depression. She was diagnosed with hyperlipidemia, lower back pain, hypertension and asthma. She was referred to dietary counseling for her elevated BMI and advised to quit smoking.

On June 26, 2012, plaintiff met with her psychiatrist, Joseph L. Spalding, D.O. (Tr. 498-501). She reported that she was trying to get disability for mental and physical issues. She stated that she had trouble maintaining jobs. She said she had become angry and impulsively walked out of her last job. She was not on medication at that time. She reported feeling resentment toward her ex-boyfriend, because he had reported her to the Division of Family Services and caused her to lose custody of her children. Dr. Spalding prescribed Abilify for her mood symptoms and continued Tegretol and Lexapro.

Plaintiff sought treatment at Hannibal Regional Hospital on June 27, 2012 for bloody stool associated with IBS. (Tr. 518-33). After lab testing, she was diagnosed with lower GI bleed and discharged. On July 5, 2012, she returned with a complaint of rectal bleeding, abdominal pain, dizziness when coughing, and nausea. (Tr. 560-63). She was referred to an internal medicine specialist. On July 25, 2012, plaintiff sought treatment for neck pain. (Tr. 624-27). She stated she had not been sleeping well since starting Abilify. She was instructed to take Flexeril

and to do stretching and strengthening exercises for the neck pain. She was advised to see Dr. Spalding for her sleeping difficulties.

On August 20, 2012, Dr. Spalding completed a medical source statement. (Tr. 618-20). He opined that plaintiff had mild difficulty in understanding, remembering, and carrying out complex instructions. She had moderate difficulty in her ability to carry out complex work-related decisions, interact with the public, supervisors, and coworkers, and respond appropriately to usual work situations and changes in routine. Dr. Spalding noted that plaintiff had bipolar disorder and social phobia with anger outbursts, impulsivity, assaultive ideation and suicidal ideation.

On October 11, 2012, Carrie E. Danner, MSW, LCSW conducted an initial psychiatric diagnostic assessment of plaintiff at Hannibal Clinic. (Tr. 645-47). Plaintiff reported that she would only get out of bed to eat or go to the bathroom, and that she had no interest in daily activities. She said she was afraid she would hurt others, and felt she could avoid it by living like "a hermit." (Tr. 645). She reported having nonrestorative sleep. Ms. Danner noted that plaintiff had high irritability, hypersensitivity, chronic depression, hopelessness, suicidal thoughts once a month, overwhelming feelings of guilt for losing her children, and excessive crying. Ms. Danner diagnosed plaintiff with PTSD, mood disorder, high blood pressure, problems with financial stressors and unemployment, and chronic mental illness. She assigned plaintiff a GAF score of 55.

### III. The ALJ's Decision

In the decision issued on September 14, 2012, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015.

2.	Plaintiff has not engaged in substantial gainful activity since January 15, 2011, the alleged onset date.

3.	Plaintiff has the following severe impairments:   major depressive disorder, social phobia, and myalgias of unknown etiology.

4.	Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.	Plaintiff has the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except she is limited to simple, routine, repetitive tasks with no more than superficial interaction with the public or coworkers.

6.	Plaintiff is unable to perform any past relevant work.

7.	Plaintiff was born on July 28, 1977 and was 33-years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.	Plaintiff has at least a high school education and is able to communicate in English.

9.	Transferability of job skills is not material to the determination of disability, because using the Medical-Vocational Rules as a framework supports a finding that the plaintiff is "not disabled," whether or not plaintiff has transferable job skills.

10.	Considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.	Plaintiff has not been under a disability as defined in the Social Security Act from January 15, 2011 through the date of the decision.

(Tr. 10-29).

## IV.   Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled."  Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance,

but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an

administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the

claimant's complaints.  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past."  20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.  Discussion

Plaintiff argues that the ALJ incorrectly determined that her mental impairments do not meet the requirements of a Listing; failed to address a conflict between the testimony of the vocational expert and the opinion of her treating psychiatrist; and improperly demonstrated bias against or a misunderstanding of mental illness.

### A.  Listings 12.04 and 12.08

The ALJ found that plaintiff had the severe mental impairments of major depressive disorder and social phobia. Plaintiff asserts that the ALJ erred in failing to find that her impairments meet the requirements for Listing 12.04, pertaining to affective disorders, and Listing 12.08, pertaining to personality disorders. 20 C.F.R. § 404, Subpart P, App. 1.

Each Listing provides specified criteria set forth in sections entitled A, B, and C, which a claimant must satisfy in various combinations to qualify. Id. Paragraph A sets forth the criteria to determine the presence of a specific mental disorder. Id. Paragraphs B and C set forth criteria describing impairment-related functional limitations; these limitations must be the result of the mental disorder found in Paragraph A. Id.

Plaintiff challenges the ALJ's determination regarding the B criteria, which are identical for both Listing 12.04 and Listing 12.08. To satisfy the B set of criteria for Listing 12.04 and Listing 12.08, a claimant must show that she suffers at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

Id. A "marked" limitation may arise when "several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." Id. The severity standards for Listing-level impairments are high, because "the listings [for adults] were designed

to operate as a presumption of disability that makes further inquiry unnecessary[.]"
Malott v. Colvin, 4:13-00877-CV-W-NKL, 2014 WL 2759421, *3 (W.D. Mo. June 18,
2014) (quoting Sullivan v. Zebley, 493 U.S. 521, 532 (1990) (alterations in
original)).   It is the plaintiff's burden to show that she meets all of the specified
criteria of a Listing.   Id. (citing Boettcher v. Astrue, 652 F.3d 860, 863-64 (8th Cir.
2011); Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010)).

The ALJ determined that plaintiff had mild restrictions of the activities of daily
living.   Plaintiff was able to perform housework and yard work, cook, drive, go
shopping, and care for her own grooming and hygiene.   (Tr. 24).   To pass time
during the day, she worked on her cross-stitching, crocheted, and read.   (Tr. 56).
While she reported neglecting her grooming and hygiene due to her depression, all
of her treatment records report she appeared adequately groomed with good
hygiene.   The consulting psychologist, Dr. MacDonald, reported that plaintiff told
her she woke up between 9:00 A.M. and 10:00 A.M. each morning to feed her fish,
uncover her birds and give them fresh water.   (Tr. 357).   She played with her son
in the afternoon, sometimes babysat, and enjoyed paint-by-numbers, listening to
music, and playing games on the computer.   While plaintiff testified that she
sometimes does not get out of bed for days, her reported activities suggest that her
ability to function on a daily basis was not severely impaired.   Substantial evidence
thus supports the ALJ's finding that plaintiff did not met her burden to establish she
had marked difficulties in the activities of daily living due to a mental impairment.

The ALJ found that plaintiff had moderate difficulties with concentration,
persistence, and pace.   Plaintiff alleges that the ALJ ignored her testimony that her
PTSD causes "daydreams" almost daily concerning the periods in her life in which

she witnessed a homicide and incidents in which she was physically abused. The ALJ noted that there was evidence suggesting plaintiff has interference with concentration, persistence, and pace due to her depression and occasional, intermittent PTSD symptoms. (Tr. 24). He also noted, however, that plaintiff reported an ability to engage in a number of activities that required sustained periods of attention and concentration, such as crocheting, completing paint-by-numbers, caring for her birds and fish, cross-stitching, reading, watching television, and playing games on the computer. The ALJ's determination, thus, was supported by substantial evidence in the record.

The ALJ found that plaintiff had moderate restrictions in the area of social functioning, citing plaintiff's testimony that she stayed home most of the time and lived like a hermit, but was able to go shopping. (Tr. 25). She disliked being around other people, but interacted with her son and son's father at home and also sometimes babysat. (Tr. 357). The evidence as a whole supports the ALJ's finding of moderate restrictions on plaintiff's ability to socially function.

Finally, the ALJ found no episodes of decompensation. Plaintiff reported some past suicide attempts, but these occurred six or seven years prior to her alleged onset date. Accordingly, the ALJ properly determined that plaintiff's mental impairments did not meet the criteria of Listings 12.04 and 12.08.

### B. <u>Testimony of the Vocational Expert and the Opinion of Dr. Joseph L. Spalding</u>

Plaintiff argues that the ALJ gave Dr. Spalding's medical source statement great weight, characterizing it as well-reasoned and well-explained, but failed to apply Dr. Spalding's statement to his RFC determination.

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)). "Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in this case." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

The ALJ concluded that plaintiff had the RFC to perform light work, but was limited to simple, routine, repetitive tasks with no more than superficial interaction with the public or coworkers. (Tr. 14). In determining plaintiff's RFC, the ALJ found that her statements regarding the intensity, persistence and limiting effects of her symptoms were not credible. (Tr. 25). In reaching this conclusion, the ALJ found that plaintiff's daily activities were consistent with the ability to perform light work. (Tr. 23). She testified that she drove, shopped, mowed the lawn and did not have problems completing housework or bathing. See Medhaug v. Astrue, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."). She also engaged in hobbies such as crocheting,

cross-stitching, caring for her birds and fish, reading, listening to music, and playing with her son.

The ALJ noted that plaintiff had held a number of jobs despite her impairments. (Tr. 25). She had worked for two-and-a-half years at General Mills immediately preceding the alleged onset date of her disability. She also had been able to obtain a new job as a nurse's aide in December 2010. Her psychiatric records suggested that she had significant improvement in her mental health symptoms when she consistently used prescribed medications. See Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (finding that plaintiff's part-time employment for three years after her strokes, "coupled with the absence of evidence of significant deterioration in her condition, demonstrate the impairments are not disabling in the present").

Furthermore, the ALJ noted that none of her complaints of aches, pains or other physical symptoms were substantiated by objective medical testing. See Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) ("[A]n ALJ is entitled to make a factual determination that a claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."). For example, plaintiff testified that she suffered from sciatica and bulging discs in her neck, but MRIs showed no disc bulges and EMG and nerve conduction studies were negative. (Tr. 25). The ALJ also noted speculation in the medical records that plaintiff's physical complaints were a manifestation of her mental illness. The ALJ's credibility determination, therefore, was supported by good reasons and substantial evidence and thus receives deference. Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

In considering the medical evidence in reaching a RFC determination, the ALJ gave great weight to the opinions of plaintiff's treating psychiatrist, Dr. Spalding, and consultative examiner, Dr. MacDonald. (Tr. 26-27). Dr. Spalding opined that plaintiff had no restrictions understanding, remembering, and carrying out simple instructions or making simple work-related decisions. (Tr. 618). Dr. Spalding also found that plaintiff had moderate restrictions on making judgments on complex work-related decisions, and interacting appropriately with the public, supervisors, and co-workers. (Tr. 618-619). Dr. Spalding based his findings on plaintiff's bipolar disorder and social phobia with anger outbursts, impulsivity, assaultive ideation, and suicidal ideation. (Tr. 619). Similarly, Dr. MacDonald found that plaintiff could sustain a 40-hour workweek on a continuous basis if the work was simple and not detailed. (Tr. 355). Dr. MacDonald also opined that plaintiff's major depressive order and borderline personality disorder would affect her ability to interact socially and adapt to her environment. The ALJ found both opinions well-reasoned and consistent with the doctors' treatment records and evaluations.

Following the ALJ's RFC assessment and conclusion that the plaintiff could not perform her past relevant work, which involved medium exertion and semi-skilled labor, the burden shifted to the Commissioner to show that plaintiff could perform other work existing in a significant number of jobs within the national economy. At this step of review, the ALJ questioned a vocational expert regarding a hypothetical claimant of plaintiff's age, education, work experience and RFC. The vocational expert testified that such an individual could perform the requirements of occupations such as housekeeping, machine tending, and manual work. (Tr. 78). In response to a question from plaintiff's attorney as to what percentage of the time

an individual could be off task and still be considered employable, the vocational expert replied "no more than 10 percent of the time." (Tr. 79-80).

Plaintiff notes that in Dr. Spalding's medical source statement, an assessment of "moderate" means "the impairment will interfere with the individual's ability to perform work-related activities twenty-to-thirty percent of the time." (Tr. 618). Based on the vocational expert's testimony that an individual could be off-task no more than 10% of the time to be considered employable, plaintiff argues that she was therefore unemployable. Dr. Spalding's assessment, however, did not conclusively opine as to how frequently plaintiff would be off-task in any particular job. His finding that plaintiff had moderate restrictions related only to her general ability to make complex work decisions and interact appropriately in work environments with others. This finding is consistent with the ALJ's conclusion that plaintiff could perform light work with simple, routine tasks and no more than superficial interaction with others. Dr. Spalding's opinion is unrelated to the vocational expert's determination of other work plaintiff would be capable of performing and her ability to stay on-task with the requirements of those jobs in the national economy. Plaintiff has conflated these two percentages, despite their differing roles at different stages in the ALJ's overall determination. Based on the plaintiff's RFC and the vocational expert's testimony, therefore, the ALJ properly determined plaintiff could perform other work that existed in significant numbers in the national economy.

## C.  The ALJ's Conduct at the Hearing

Plaintiff also argues that the ALJ erred by demonstrating a bias against or complete misunderstanding of mental illness. "ALJs and other similar quasi-judicial

administrative officers are presumed to be unbiased." <u>Perkins v. Astrue</u>, 648 F.3d 892, 902 (8th Cir. 2011) (quoting <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001)); <u>see also</u> <u>Partee v. Astrue</u>, 638 F.3d 860, 865 (8th Cir. 2011) ("There is a presumption of honesty and integrity in those serving as adjudicators.") (internal quotations omitted).  A claimant bears the burden of producing sufficient evidence to overcome this presumption.  <u>Perkins</u>, 648 F.3d at 902.

At the hearing, the ALJ elicited testimony regarding the specific reasons plaintiff thought she could not return to each past job she held.  (Tr. 67-70).  With these questions, the ALJ was fulfilling his obligation to determine whether plaintiff could engage in any past relevant work.  20 C.F.R. § 404.1520(e).  The ALJ ultimately concluded she could not, in light of her impairments; therefore, this line of questioning does not demonstrate a bias against mental illness.

At the hearing, the ALJ also questioned plaintiff about Dr. Nichols' medical notes from a visit to Hannibal Clinic in December 2011.  During the visit, plaintiff was asked why she felt she needed to get on disability and she responded that she just "can't deal with it."  (Tr. 609).  The ALJ asked plaintiff what she meant by that, and suggested that her goal should be to return to work if possible.  (Tr. 71). According to the doctor's notes from the visit, Dr. Nichols opined that her physical complaints were symptoms of her mental illness, and she "need[ed] to go ahead and just try to function in her job."  (Tr. 609).  Rather than demonstrating a misunderstanding of mental illness, the ALJ's questions and comments suggest that he was trying to develop a full record by considering all of the evidence before him. The ALJ noted that he would not exclusively rely upon Dr. Nichols' report following plaintiff's attorney's interjection, (Tr. 73), and referred to the report in his opinion

as "some speculation in the record." (Tr. 27). To demonstrate bias, a claimant is "required to show that the ALJ's behavior, in the context of the whole case, was so extreme as to display clear inability to render fair judgment." Perkins, 648 F.3d at 903 (internal quotations omitted). The ALJ's conduct at the hearing did not rise to this level.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A judgment in accordance with this Memorandum and Order will be entered separately.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of March, 2015.